## CIRCUIT COURT OF THE CITY OF ROANOKE

Shelby Blankenship, Adm'x of the
Estate of Jackie Allen Eppling,
deceased

v.

Commercial Distributors, Inc.,
t/a Southern Manor Home for Adults

May 30, 1989

Case No. CL88000562

### By JUDGE DIANE McQ. STRICKLAND

I am in receipt of [the] memoranda of authorities concerning plaintiff's motion in limine and defendant's motion for expert testimony.

The material facts are as follows: Southern Manor is a licensed home for adults subject to state regulations promulgated pursuant to § 63.1-172, *et seq.* of the Code of Virginia, 1950, as amended. The majority of its residents are mentally incapacitated; however, Southern Manor provides no medical treatment to residents other than that prescribed by personal physicians.

The plaintiff's decedent, a diagnosed paranoid schizophrenic, had been a resident at Southern Manor for approximately five years. In 1986 and again in 1987 the decedent, Jackie Eppling, was found on Wasena Bridge expressing suicide intentions. On both occasions he was hospitalized.

On January 27, 1988, Mr. Eppling appeared at the office of his psychiatrist, Dr. Narendra C. Shah, with his suitcases packed, requesting to be hospitalized. He was returned to Southern Manor. On January 28, Mr. Eppling's mother contacted Southern Manor to complain of Mr. Eppling's bizarre behavior demonstrated during recent visits to

her home. On January 29, Mr. Eppling fell on two occasions at Southern Manor. On both occasions he was found shaking and complaining of stomach pains. The rescue squad was called but did not take Mr. Eppling to the hospital due to his desire to go only to Catawba. On January 30, Mr. Eppling demonstrated bizarre behavior in the dining hall, and a staff member contacted the director who determined that he should be hospitalized. While the arrangements for hospitalization were being effected, Mr. Eppling was apparently left unattended. He left the home and walked to the Wasena Bridge, where he jumped to his death.

Defendant contends that the plaintiff must produce expert testimony to establish the standard of care which Southern Manor owes to its residents. Both plaintiff and defendant agree that there exist no Virginia cases on point. While it is well established in Virginia that expert testimony is needed in medical malpractice cases, *Grubb v. Hocker*, 229 Va. 172, 326 S.E.2d 698 (1985), it is agreed that Southern Manor is not a health care provider.

Defendant relies upon *Maricopa County v. Cowart*, 106 Ariz. 69, 471 P.2d 265 (1970), in which the Supreme Court of Arizona held that expert testimony was necessary to establish the standard of care owed by a juvenile detention home to its residents. Defendant argues that *Maricopa* is similar to the present case in that both involve allegations of negligence of a facility's staff in failing to appropriately supervise a resident which resulted in the suicide of that resident. Plaintiff cites *Johnson v. Grant Hospital*, 286 N.E.2d 308 (Ohio App. 1972), *Paulen v. Shinnick*, 289 N.W. 162 (Mich. 1939), *Stallman v. Robinson*, 260 S.W.2d 743 (Mo. 1953), and *Wright v. State*, 300 N.Y.S.2d 153 (1969), all of which involved suicides of patients confined to mental institutions. In each of these cases, the courts ruled that expert testimony was not required to establish the standard of care owed by the facility to the patients.

While expert testimony may be necessary where a technical or complex matter is involved, it is not necessary to establish nonmedical, administrative, ministerial, or routine care. *Necessity of Expert Evidence to Support Action Against Hospital for Injury to or Death of Patient*, 40 A.L.R.3d 515, 518 (1971). This distinction must be applied to plaintiff's theories of liability in order

to ascertain whether expert testimony is required. Plaintiff articulates three theories of liability: (1) defendant should have acted sooner to hospitalize Eppling because of his prior suicide attempts; (2) defendant should have detained Eppling or at least monitored his whereabouts while arrangements were being made for hospitalization; (3) defendant is inadequately staffed in terms of number of personnel and their training.

Theories (1) and (2) involve administrative or ministerial matters not requiring expert testimony. In *White v. United States*, 244 F. Supp. 127 (E.D. Va. 1965), and *Breeze v. State*, 449 N.E.2d 1098 (Ind. App. 2 Dist. 1983), the courts ruled that the legal duty owed to safeguard a patient from self-inflicted injury was dictated by knowledge of the patient's mental state and prior suicide attempts. This standard would be appropriate for application in the present case. The defendant's staff is not medically trained and, therefore, would evaluate the information concerning the patient's mental state and prior suicide efforts in much the same way as with members of the lay jury deciding the case. Accordingly, it is not necessary that expert testimony be provided in support of either of these theories of liability.

The plaintiff's third theory of liability concerning defendant's number of staff and their training does involve technical or complex matters of opinion. This theory appears to come within the ruling of *Maricopa County* where the Arizona Supreme Court required expert testimony to establish a standard of care, including the education and background of the facility's personnel and the ratio of staff to residents. 471 P.2d at 268. A lay jury is not equipped with the necessary expertise to make the appropriate determinations concerning the proper training of supervisory staff nor the appropriate ratio of staff to residents and, therefore, expert testimony concerning this theory is required.

Plaintiff has moved in limine to exclude expert testimony by the defendant on all of plaintiff's theories of liability. Specifically, plaintiff has requested that the testimony of Nancy Karnes, an employee of the Virginia Department of Social Services, who investigated the matter involved herein, be limited to her findings of fact. Again, we must look at the plaintiff's theories of liability

in determining the admissibility of Ms. Karnes's testimony. With regard to plaintiff's third theory, that involving defendant's staff, it would be appropriate to admit testimony by Ms. Karnes beyond her findings of fact if it is established that she has particular expertise concerning the staffing of adult homes which would assist the trier of fact in addressing this issue of liability. At this juncture, it would not appear that Ms. Karnes would have any expertise superior to that of the lay jurors with regard to the issues of hospitalization and supervision and, therefore, unless her expertise is further established, opinion testimony by her concerning these two theories of liability would be inadmissible.

Plaintiff also contends that the testimony of Mr. Eppling's treating psychiatrist, Dr. Shah, should be limited to his diagnosis, his observations of Mr. Eppling on January 27, and any communications that he may have had with the defendant. Plaintiff moves to exclude opinion testimony by Dr. Shah concerning the appropriateness of defendant's management of Mr. Eppling. The Court is unaware of what, if any, expertise Dr. Shah might have concerning the staffing of homes for adults. Unless such expertise can be established, his testimony on this theory would not be admissible. On the theories of the timeliness of the decision to hospitalize and the need to monitor Mr. Eppling's whereabouts pending hospitalization arrangements, it would appear that Dr. Shah's opinions would indeed be instructive to lay triers of fact, *Thurston Metals & Supply Co. v. Taylor*, 230 Va. 475, 339 S.E.2d 538 (1986), in that these are matters with which he is involved in a regular basis in his capacity as a treating physician. Accordingly, the testimony of Dr. Shah as to these matters would be admissible.