# CIRCUIT COURT OF ROCKINGHAM COUNTY

Timothy I. Lloyd

v.

Robert C. Kime, III, et al.

September 21, 2009

Case No. CL04-00262

BY JUDGE JAMES V. LANE

This medical malpractice action was tried before a jury April 29 to May 1, 2009, on the limited issue of post-operative care. The jury found for the defendant. Plaintiff timely filed a Motion to Set Aside the Verdict and Grant a New Trial. The Court heard argument on Plaintiff's motion on September 14, 2009. Plaintiff assigns the following errors and asks that the Court set aside the jury verdict as a result of each:

(1) "The Court violated Va. Code § 8.01-401.1 and the Supreme Court of Virginia's holding in *Bostic v. About Women OB/GYN*, 275 Va. 567 (2008)."

(2) "Dr. Kebaish is not allowed to state the opinions of the spinal surgery community; it is inadmissible hearsay."

(3) "The Court's errors were highly prejudicial."

(4) "The out-of-court hearsay opinion objected to by Lloyd even included double and triple hearsay."

Upon review of the trial transcript and the applicable case law, the Court now finds that it committed no error and, therefore, denies plaintiff's motion.

I. *Cross-Examination of Dr. Corkill*

Plaintiff's primary argument concerns the manner of cross-examination of plaintiff's expert witness, Dr. Corkill. Specifically, plaintiff alleges that the Court erred in allowing defense counsel to ask Dr. Corkill about articles that Dr. Corkill did not accept as authoritative.

It is long settled that a party may cross-examine an expert about a matter "which he recognizes as standard upon the subject matter involved." *Hopkins v. Gromovsky*, 198 Va. 389 (1956) (quoting *Lawrence v. Nutter*, 203 F.2d 540, 543 (4th Cir. 1953)). In 1994, the General Assembly amended § 8.01-401.1 to allow the testimony of out-of-court declarant authors to be admissible as substantive evidence, rather than merely as a means of testing the expertise of the witness. *See Bostic v. About Women OB/GYN*, 275 Va. 567, 577 (2008). The applicable statute, § 8.01-401.1, now reads, in part:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by testimony or by stipulation shall not be excluded as hearsay. If admitted, the statements may be read into evidence but may not be received as exhibits. If the statements are to be introduced through an expert witness upon direct examination, copies of the statements shall be provided to opposing parties thirty days prior to trial unless otherwise ordered by the court.

Va. Code § 8.01-401.1 requires different elements for the use of an article on direct and cross-examinations, as an expert need not have "relied upon" the article to have it "called to [his] attention . . . upon cross-examination." By design, the statute allows a party to cross-examine an expert on an article that the expert has not used to prepare for trial, in effect, opening the gates to confront him with other scientific material. The material that the expert admits is authoritative comes in as substantive evidence.

The Supreme Court of Virginia has ruled that it is improper to cross-examine an expert witness with an article that the witness does not accept as standard and authoritative even though the witness recognizes the author of the article as authoritative. *Griffett v. Ryan*, 247 Va. 465, 473 (1994) ("The article that is used during cross-examination, not the author, must be

recognized by the witness as standard and authoritative in the field."). Virginia case law, however, does not demarcate the required degree of acceptance or denial of an article by an adverse witness for its admission as substantive evidence before the jury. In *Bostic v. About Women OB/GYN*, 275 Va. 567 (2008), an expert on direct examination was unwilling to say whether or not he agreed with the authorities being read to him. *Id.* at 573-74. The Court held that "the witness [on direct examination] must testify that he relied on the article in forming his opinion, which is consistent with the views of the absent author." *Bostic*, of course, dealt with direct examination, and not with the more unpredictable and contentious effort on cross-examination to pin down a witness on whether or not he endorses an article as standard and authoritative. *Bostic* does not forbid a party from cross-examining an expert with an article when that expert does not reject the findings of the article. Indeed, such a requirement would encourage experts to be evasive and to avoid offering clear opinions.

The cross-examination at issue here occurred on April 29, 2009, at pp. 267-93 of the transcript. Defense counsel confronted plaintiff's expert with three articles. Defense counsel asked Dr. Corkill whether he disagreed with the first article, "Methylprednisolone for Acute Spinal Cord Injury, an Inappropriate Standard of Care," which appeared in the *Journal of Neurosurgery Spine* in 2000:

Q: Do you disagree with that statement?
A: Where is it coming from?
Q: The same paper.
A: Yeah, the paper is a, one man's opinion.
Q: And so you disagree with —
A: He is a single author on it.
Q: I am just going to ask you if you agree with the statement.
A: He is a single author, so one author versus ten spinal cord injury centers, and it is the current treatment, even today the medical treatment.
Q: This is 2000.
A: It is mentioned.

(Trial Tr. vol. 1, 274, April 29, 2009.) The factual issue at trial was the standard of care in the year 2000. Dr. Corkill never expressed disagreement with the article as expressive of the standard beliefs of that time period. Later, he said, "What he is saying in the paper, you're quite right, and I just

recognize there was a debate back then. It's nine years ago, is not it?" (Tr. 274-75.) Defense counsel asked Dr. Corkill yet again about the authoritativeness of the article from *Spine*:

Q: Dr. Corkill, I believe you testified that the periodical *Spine* was reliable authority correct?
A: I think I testified that the articles in these journals can be outdated and they can be wrong, but they are generally reliable.
Q: Generally reliable; correct?
A: On a possibly limited time basis.

(Tr. 276.) Dr. Corkill asserted that the 2000 Spine article was outdated, but also that it was generally indicative of the science at that time, and that it was one voice in the scientific debate going on in 2000. Because the issue in the case was the standard of care, not in 2009, but in 2000, the Court finds that Dr. Corkill "accepted" the article for the purposes of § 8.01-401.1 as a reliable authority back in 2000, the time in which Dr. Kime would have relied upon it.

The second article that defense counsel introduced on cross-examination came from the *Canadian Journal of Neurological Studies* in 2008. (Tr. 276-78.) Dr. Corkill did not endorse the findings of the article, saying: "I do not take that journal, as a matter of fact. It is Canadian. What center is it?" (Tr. 277.) However, when the Court questioned the relevance of the findings of a 2008 article to the standard of care in 2000 to 2001, defense counsel ceased discussing the article. At closing argument, defense counsel's only mention of the article was to say: "Dr. Corkill agreed with me that the *Journal of Canadian Neurosurgery* was a reliable authority." (Trial Tr. vol. 3, 886, May 1, 2009.) Viewing the record, it does not appear that the reading of a brief excerpt from this article in order to ascertain whether Dr. Corkill agreed with it could have prejudiced the plaintiff. Because § 8.01-401.1 allows cross-examination regarding articles that an expert did not rely upon, the jury will naturally have *de minimis* exposure to articles and statements that the expert does not endorse, as the expert has to know what he is or is not endorsing before he does so. The Court finds that the reading of the brief excerpt from *Canadian Journal of Neurological Studies* falls in such a *de minimis* classification, as the exposure was brief, as the Court questioned the article's relevance before the jury and as defense counsel did not read excerpts from it during closing arguments.

The third article defense counsel read on cross-examination was a 2000 article by Dr. Benzel of the Cleveland Clinic entitled, "A Critical Appraisal of the Reporting of the National Acute Spinal Cord Injury Studies (II and III) of Methylprednisolone in Acute Spinal Cord Injury." (Tr. vol. 1, 278-93.) Dr. Corkill accepted Dr. Benzel as an authority, indicating that he had several of Dr. Benzel's articles with him on the witness stand. (Tr. 278.) However, it is not enough for the expert on cross-examination to recognize the author as authoritative; he must endorse the article as well. *Griffett*, 247 Va. at 473. When asked whether he agreed with the statement read to him from the 2000 article, Dr. Corkill attempted to read from Dr. Benzel's 2005 text (Tr. 281), which had not been designated and which reflected *post facto* time frame for standard of care. The Court observed that Dr. Corkill had not recognized "this group, this article, this journal" as authoritative. (Tr. 284.) The following colloquy ensued:

> Mr. Sipe: The Journal of Spinal Disorders.
> The Court: And that is an authoritative source?
> The Witness: I do not know it, but sure it is.

(Tr. 284-285.)

In assessing Dr. Corkill's acceptance or denial of the article as authoritative at the time of its publication, the Court looks to his ringing endorsement of Dr. Benzel as a factor (though not a determinative one), as well as his acceptance of the journal as authoritative and his general reluctance to answer questions regarding the 2000 Benzel article. The witness was caught in the somewhat awkward circumstance of either opining that Dr. Benzel had written a non-authoritative article or admitting that the standard of care submitted by defendant was the correct one. The Court, upon review of the transcript, finds that it was not unfair for the jury to hear excerpts from Dr. Benzel's 2000 article as substantive evidence on the standard of care in 2001. Dr. Corkill's spirited avoidance of the article upon repeated inquiries as to its authoritativeness serves as an acceptance for the purposes of Va. Code § 8.01-401.1.

## II. *Statement of Dr. Kebaish*

Plaintiff asserts that the jury verdict should be set aside because the Court did not strike from the record or instruct the jury to disregard the statement of Defendant's expert, Dr. Kebaish, that "there is nothing in the spine surgeon community saying that you have to give a steroid or you do not

have to give a steroid." (Tr. vol. 3, 778.) Plaintiff argues that, under *McMunn v. Tatum*, 237 Va. 558 (1989), Dr. Kebaish may rely on out-of-court hearsay opinions in formulating his own opinion, but he is only allowed to express before the jury his own opinion." (Pl.'s Motion ¶ 5.) In *McMunn*, the defense expert witness was ready to testify on direct examination that, in his opinion, plaintiff's wounds were self-inflicted. 237 Va. at 563. He based his opinion in part on the notes of two doctors who had treated the plaintiff at the Mayo clinic, as one of the notes said: "There are patients that like to be patients." *Id.* at 563-64. On appeal, the defense objected to the exclusion of the note's contents on direct examination, but the Supreme Court of Virginia disagreed:

> We now hold that Code § 8.01-401.1 does not authorize the admission in evidence, upon the direct examination of an expert witness, of hearsay matters of opinion upon which the expert relied in reaching his own opinion, notwithstanding the fact that the opinion of the expert witness is itself admitted, and notwithstanding the fact that the hearsay is of a type normally relied upon by others in the witness' particular field of expertise.

*Id.* at 566. The facts in the current case are inapposite to *McMunn*. The witness in McMunn was going to use out of court statements, the doctor's note from the Mayo clinic, to prove the truth of the matter asserted, that the plaintiff's wounds were self inflicted. In the present case, Dr. Kebaish did not use any out-of-court statement. His statement that "there's nothing in the spinal surgeon community saying that you have to give a steroid or don't have to give a steroid" is a general observation of a negative fact and an offering of an out-of-court statement. While an expert witness cannot state that he has talked to others who agree with his view, *Satcher v. Commonwealth*, 244 Va. 220, 246 (1992), Dr. Kebaish did not claim to have consulted with other experts who confirmed his view as correct. *See also Todd v. Williams*, 242 Va. 178, 180-81 (1991) (holding that an expert witness should not have been allowed to testify as to the conclusions of two other experts with whom he consulted on the matter and who shared his views). Therefore, the Court finds that Dr. Kebaish's statement was not inadmissible hearsay.

Even if Dr. Kebaish's original statement was inadmissible hearsay, the Court finds no prejudice to the plaintiff because the witness rephrased his statement and the Court announced to the jury that the witness was offering only his own opinion:

Q: Dr. Kebaish, based on your education, your training, and your experience, do you have an opinion as to whether the standard of care required the administration of steroids any earlier than was done in this case?

A: Again, when I say spine community, I am part of the community. I am talking about me.

Q: Again, sir, you may answer the question.

A: Just to clarify what I had mentioned, so it is my opinion because I am part of this community.

The Court: It is *his* opinion.

Mr. Sipe: Yes, sir.

The Witness: So it is — again, sir, it depends on the clinical judgment. There is no appropriation to do it or not to do it. Sometimes doing it may help. Sometimes doing it may hurt. So it is really a clinical judgment.

(Tr. 789) (italics added.) Upon review of the transcript, it does not appear that plaintiff suffered any prejudice from Dr. Kebaish's original statement regarding the spinal community. After a long colloquy over the hearsay objection, the Court clarified to the jury that the witness was stating only his opinion. Dr. Kebaish rephrased his original statement such that the jury would understand that he was only giving his opinion. Under these circumstances, the Court finds that plaintiff suffered no harm from the Court's decision not to give the jury a special curing instruction.

### III

Plaintiff asserts that "[t]he Court's errors of allowing into evidence out-of-court hearsay statements and opinions were grossly prejudicial because this evidence was allowed to rebut Dr. Kime's own testimony that the Solu-medrol of the Acute Spinal Cord Injury Protocol was 'appropriate and necessary' when there was a 'clear-cut new neurologic injury'." (Pl.'s Motion ¶ 11.) Plaintiff both mischaracterizes Dr. Kime's deposition testimony and misunderstands the issue. Dr. Kime testified that he would give the steroid if there were a new neurological injury, but that, during the immediate post-operative phase, he believed that there was no new injury to the spine, which is why he did not give the steroid. In other words, there was no "clear-cut new neurologic injury" that would make the administration of the steroid "appropriate and necessary." Dr. Kime's testimony is entirely consistent with the journal articles that the defense used to confront Dr. Corkill. These articles stated that the steroid should not be given as a matter

of course after a spinal surgery. Furthermore, it was for the jury to decide when it became appropriate, based on the information that Dr. Kime had before him, to administer the steroid.

Plaintiff also alleges that the articles rebutted Dr. Kime's testimony regarding the efficacy of Solu-Medrol. (Pl.'s Motion ¶ 9.) The Court finds that these articles were collateral, as the jury did not need the journal articles at issue to believe Dr. Kime and find in his favor. Even if Solu-Medrol were ineffective, as the articles used by defense indicated, such a fact would not conflict with Dr. Kime's testimony that he gave the steroid when a new injury manifested, and no such injury manifested in the time period at issue. Thus, even if this Court improperly admitted the articles into evidence, doing so was not prejudicial to plaintiff's case.

## IV

Plaintiff assigns error to the Court's exclusion of evidence regarding the change in the way the medical community viewed the efficacy of steroid administration after spinal surgery. Plaintiff argues that statements from the 2008 article by Dr. Benzel should have been admitted on the issue of causation. Upon review of the record, the Court finds that the 2008 article by Dr. Benzel was properly excluded, as its prejudicial effect substantially outweighed its probative value in the context in which it arose. Plaintiff's expert, Dr. Corkill, testified on direct examination as to causation, specifically that Dr. Kime did not order an MRI immediately or when he first discovered that the plaintiff could not move his leg. (Tr. vol. 1, 235.) Dr. Corkill concluded that this delay in ordering an MRI led to a lag in diagnosing a spinal cord contusion, and thus a delay in the steroid administration. (Tr. 235.) During the cross-examination and redirect examination of plaintiff's expert, Dr. Corkill, the Court denied plaintiff the opportunity to show that Dr. Benzel in 2008 had changed the approach he took to post spinal surgery steroid administration in 2000. Considering that the issue before the jury in that particular context was the standard of care in 2000, the Court finds no error in excluding Dr. Benzel's 2008 article. Not only would its admission blur the issue and confuse the jury, its prejudicial effect would have substantially outweighed its probative value.

## V

Plaintiff argues that the Court should set aside the jury verdict because "the out-of-court hearsay included double and triple hearsay." (Pl.'s Motion ¶ 11.) Specifically, plaintiff takes issue with the reference to the Food

and Drug Administration in Dr. Benzel's 2000 article, with which defense counsel confronted Dr. Corkill. Plaintiff does not cite to the record, but the Court will treat the question on page 288 of the transcript as the one with which plaintiff takes issue:

> Furthermore, the procedure for obtaining a drug indication in the United States is very clear. It requires verification and scrutiny by the FDA. There is no excuse for bypassing the FDA. It implies that the FDA would not have granted an indication if an application was submitted.

Again, Plaintiff misunderstands the hearsay rule. The FDA has not made a statement that is being offered for the truth of the matter asserted. Rather, Dr. Benzel is concluding that the FDA would not grant an indication for Solu-medrol based on their procedures for granting an indication, which are a matter of public record. This is not "double hearsay."

### Conclusion

For the reasons stated herein, the Plaintiff's Motion to Set Aside Jury Verdict and Grant New Trial is denied.